REX D. GARNER (SBN 9401)
rgarner@foxrothschild.com
MARK J. CONNOT (SBN 010010)
mconnot@foxrothschild.com
FOX ROTHSCHILD LLP
One Summerlin
1980 Festival Plaza Dr.
Suite 700
Las Vegas, Nevada 89135
Telephone:    702.262.6899
Facsimile:     702.597.5503

Attorneys for Plaintiff EMULAIT, INC. f/k/a
PROXAMAMA, INC.

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| EMULAIT, INC. f/k/a PROXAMAMA, INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ROEMBKE TURNKEY SOLUTIONS, LLC, ROEMBKE MFG. & DESIGN, INC., and GREGORY J. ROEMBKE, | |
| Defendants. | |

Plaintiff, Emulait, Inc. f/k/a Proxamama, Inc. ("Emulait"), by and though undersigned counsel, brings this action against Defendants, Roembke Turnkey Solutions, LLC ("RTS"), Roembke Mfg. & Design, Inc. ("Roembke Mfg."), and Gregory J. Roembke ("Roembke") (collectively, "Defendants"), and avers as follows:

## NATURE OF ACTION

1.      In or about 2015, Emulait's founder, Shilo Ben Zeev, was inspired to disrupt the baby bottle industry after observing the challenges his own family faced on their feeding journey. As with most innovations, Emulait was born to fill a gap – the gap between breast and bottle.

- 1 -

165704295.1

2.     Emulait's bottle design approximates the unique physical and developmental benefits that breastfeeding offers – often lost when bottle-feeding. The proprietary design, conceived of by the highly regarded and accomplished scientific advisory board and R&D team assembled by Emulait, supersedes conventional bottles by harnessing technology, materials, and design unutilized by Emulait's competition.

3.     In or about the middle of 2022, Emulait began its search for a manufacturer that possessed the experience and expertise to not only produce at the requisite volume, but more importantly maintain the high-level of component quality that is required for these innovative bottles and their delicate parts.

4.     Of course, when dealing with products of this nature, quality and consistency in the manufacturing process is of the utmost importance to ensure production of a uniform product meeting Emulait's exacting specifications and standards.

5.     Through its search, Emulait was introduced to Roembke and his family-owned company, Roembke Mfg., in or about May/June of 2022.

6.     Roembke represented that he and Roembke Mfg. had the expertise and resources to handle Emulait's manufacturing needs.

7.     In or about August 2022, Emulait ultimately chose Roembke to manufacture its product based off of the representations and assurances of Roembke that he and Roembke Mfg. could handle the task.

8.     Throughout these discussions in 2022, Roembke communicated as president of Roembke Mfg., as evident, in part, by his email signature used to communicate with Emulait.

**Greg Roembke** I President
**Roembke Mfg. & Design, Inc.**
1580 Baker Dr, Ossian, IN 46777

9.     The parties' agreement was later memorialized in a Manufacturing Services and Supply Agreement dated as of February 2, 2023 ("Manufacturing Agreement"), in which Roembke signed on behalf of RTS, a newly-formed limited liability company in which he is the sole member.

10.     It quickly became evident that Roembke sold Emulait a bill of goods that he could

2

not deliver, despite ultimately receiving approximately $6.5 million from Emulait (including $2 million in Emulait stock granted directly to Roembke).

11.    Although time was of the essence per the terms of the Manufacturing Agreement, extreme delays and troubles with manufacturing were almost immediate. This was due, in part, to the fact that the equipment and tooling that was provided and ultimately used to manufacture the products was: (a) inadequate, nonexistent, and unnecessarily excessive for Emulait's purposes; (b) priced egregiously above market value; (c) of woefully deficient quality; and (d) not at all what was promised.

12.    Indeed, during an unannounced visit by Emulait representatives to the manufacturing facility in Indiana, it was discovered that Defendants were using a standard kitchen toaster oven to heat certain parts as part of the manufacturing process.

13.    Making matters worse, Roembke was adamant that he be named to the Executive Board of Emulait, which he was in February 2023. Roembke intentionally and maliciously put himself in a position where he was on both sides of the bargaining table with clear conflicts of interests.

14.    By leveraging his position of trust and confidence as a Director on the Executive Board and as a large shareholder of Emulait stock, it is evident that Roembke entered into self-dealing, inflated contracts designed to misappropriate Emulait funds to bankroll the purchase of property and equipment for Roembke's newly-formed company (and building), while simultaneously depriving Emulait of the manufacturing process it desired and was promised.

15.    Unbeknownst to Emulait and its other shareholders, Roembke knew or should have known that he and his newly-formed company RTS entirely lacked what was necessary to manufacture Emulait's goods at the agreed-upon volume and under the quality control guidelines that Emulait's business required.

16.    It is apparent that Roembke sought to finance the growth of his newly-formed company (in which he is the sole member) with millions of dollars of Emulait's funds that were intended to grow Emulait's business – not Roembke's new business venture.

17.    As a result of the above and the material breaches of the Manufacturing Agreement

3

165704295.1

described further below, Emulait had to stop using Defendants and the new RTS manufacturing facility (paid for by Emulait) and look elsewhere to find a suitable facility that could properly manufacture its goods (in accordance with Section 2.2 of the Manufacturing Agreement).

18.    Through this process, Emulait learned that the equipment and tooling should have cost roughly $200,000 to $300,000 – nowhere near approaching the $6.5 million price tag from Defendants.

19.    Moreover, the new manufacturer is producing the bottles at roughly half the cost of Defendants' high volume pricing, and nearly one-eighth of Defendants' low volume pricing.

20.    Defendants have refused to reimburse Emulait for any of its damages, which total upwards of $10 million. Worse, Defendants have had the audacity to demand even more money from Emulait (almost $1 million) despite failing to deliver whatsoever under the Manufacturing Agreement and leaving Emulait with nothing of value.

21.    Accordingly, Emulait is left to institute this action and seek all available relief for the material breaches of the Manufacturing Agreement and the fiduciary duties owed to Emulait.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as the amount in controversy far exceeds $75,000 and there is complete diversity among Emulait and Defendants.

23.    This Court has personal jurisdiction over Defendants by virtue of their doing continuous and systematic business with Emulait, a Nevada corporation, which also includes Roembke serving as a Director on the Executive Board of Emulait.

24.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to Emulait's claims occurred herein.

## THE PARTIES

25.    Emulait is a Nevada corporation with a principal place of business located at 2854 Geary Place, Unit 3812, Las Vegas, Nevada 89109.

26.    RTS is an Indiana limited liability company with a principal place of business listed at 425 Industrial Parkway, Ossian, Indiana 46777.

4

165704295.1

27.    Roembke Mfg. is an Indiana corporation with a principal place of business listed at 1580 Baker Drive, Ossian, Indiana 46777.

28.    Based upon publicly available information, Roembke is an adult individual that resides at 360 E. Monroe St. Bluffton, Indiana 46714, is the sole member of RTS, and serves as president of Roembke Mfg.

**FACTS COMMON TO ALL COUNTS**

I.    **Emulait Develops Innovative Product that is Positively Received and Achieves Commercial Success**

29.    As summarized above, Emulait was founded with the goal of developing innovative products designed to help those in the early stages of parenthood.

30.    Through extensive collaboration with scientists and researchers in the fields of lactation, physiology, neonatal intensive care, and pediatrics, and after significant research and development, Emulait finalized the design of its flagship products, a line of biomimetic baby bottles designed to emulate the experience of breastfeeding and assist families in the transition from breast to bottle.

II.    **Emulait Enters into the Manufacturing Agreement that is Shortly Thereafter Materially Breached by RTS**

31.    In or about the middle of 2022, Roembke was introduced to Emulait, and discussions took place concerning the manufacturing process, production numbers, and the strict quality control standards that Emulait required.

32.    During these discussions, Roembke repeatedly represented to Emulait that he and his company, Roembke Mfg., had significant experience manufacturing and supplying products at the scale, and under the quality control guidelines, that Emulait's production would require.

33.    Throughout the discussion/negotiation process, Roembke was communicating as the president of Roembke Mfg., which was formed by Roembke's parents in or about 1976 based on publicly available records.

34.    Emulait ultimately chose to proceed with Roembke in or about August 2022, at least in part, because Roembke Mfg. had been in business for almost 50 years and appeared to have a

5

165704295.1

strong track record.

35. Ultimately, Emulait entered into the Manufacturing Agreement with RTS. Upon information and belief, RTS was specifically formed by Roembke (as sole member) for the purpose of entering into the Manufacturing Agreement, as it was created on or about August 17, 2022 based upon publicly available records later reviewed.

36. A true and correct copy of the Manufacturing Agreement is attached hereto as **Exhibit A**.[1]

37. At least some of the manufacturing of Emulait's products (roughly 35%) occurred in the Roembke Mfg. facility.

38. Upon information and belief, Roembke Mfg. also partners with an automation company located in the same facility that ultimately made some of the automation used with the equipment and tooling paid for by Emulait.

39. While RTS may be the newly-formed entity that signed the Manufacturing Agreement, Emulait reasonably believed that it was partnering with Roembke Mfg. to manufacture its products (which it did, at least in part).

40. In the Manufacturing Agreement, RTS made certain representations and warranties regarding the production of Emulait's products, including, in relevant part, the following:

    a. Pursuant to § 4, RTS was required, prior to the shipment of any RTS-produced Emulait goods, to package, mark, and otherwise prepare Emulait products in a manner acceptable to standards of common carriers for shipment, and adequate to ensure safe arrival of the products at the applicable delivery location. RTS also acknowledged that time was of the essence with respect to each delivery of products and agreed to be liable for liquidated damages in the event a delivery was delayed.

    b. Pursuant to § 9, RTS was required to maintain an acceptable quality control system and to provide a commercially reasonable failure analysis in the event of any issue in the quality of the RTS-produced Emulait products.

    c. Pursuant to § 13, RTS warranted that the products produced for Emulait would be

---

[1] Emulait was called Proxamama, Inc. at the time.

6

free from defects in materials and workmanship. This section further provides that if an epidemic manufacturing failure occurred, RTS would, at Emulait's election, either: (i) refund or credit the product price, or replace the defective products at no charge; or (ii) reimburse Emulait for all actual and reasonable expenses incurred by Emulait related to the epidemic failure, including costs associated with replacement, field costs, customer related expenses, problem diagnosis, and finished goods inventory related costs.

d. Pursuant to § 22.6, RTS warranted that it did not have, and would refrain from creating, any relationship that would present a conflict of interest with respect to RTS's relationship with Emulait or its performance under the Manufacturing Agreement.

41. Soon after the Manufacturing Agreement was executed, it became apparent that Roembke and his newly-formed LLC were woefully ill-equipped and lacked the experience and expertise necessary to perform under the Manufacturing Agreement.

42. Defendants quickly fell short on supply quotas and missed almost every delivery deadline.

43. Emulait ultimately had to do drops of its products in very limited quantities each month starting with its highly marketed initial drop in March 2023, then again in April, May, and June 2023. The products sold out extremely quickly for each drop and received positive reviews. Thousands of more bottles could have been sold.

44. Defendants had promised high volume tooling for mass production by July/August 2023. It never happened. Instead, Defendants continued to use the low volume tooling throughout the entirety of the parties' relationship.

45. Making matters worse, it was uncovered in the July/August 2023 timeframe that a component of the bottles (substrate on the base of the nipple) that was outsourced by Defendants was using an outdated CAD (computer-aided design).

46. This error caused the bottles not to vent properly, which resulted in mass collapsing issues, and in turn led to lost business, negative reviews, and a tarnished reputation.

7

165704295.1

47. Emulait also noted severe discoloration/textural irregularities on the products likely resulting from mold growth.

48. In short, Defendants failed to deliver on every front in terms of quantity and quality while also demanding millions of dollars from Emulait to fund Roembke's new business venture.

**III.    Roembke Becomes Intertwined with Emulait at His Insistence and Has Conflicting/Competing Interests**

49. While discussions and negotiations surrounding the Manufacturing Agreement were ongoing, Roembke actively sought to invest in Emulait and take on a director-type role.

50. RTS and Roembke, among other investors, ultimately executed respective Joinder Agreements to the Shareholder Agreement ("Joinder Agreements") and purchased certain shares of Emulait.

51. Concurrently with the execution of the Joinder Agreements, Emulait and its shareholders entered into an Amended and Restated Shareholder's Agreement ("Shareholder's Agreement"), wherein Emulait issued 4,500,000 shares of Class A voting Common Stock to be distributed as provided by the Joinder Agreements. A true and correct copy of the Shareholder's Agreement is attached hereto as **Exhibit B**.

52. Roembke continued to actively campaign to be put on Emulait's Executive Board and was ultimately named a Director in February 2023.

**IV.    Roembke Engages in Self-Dealing and Maliciously Prioritizes His Interests Over Emulait**

53. Emulait entered into a lease agreement ("Financing Lease") with Farnam Street Financial, Inc. ("Farnam"), whereby Farnam purchased approximately $3,500,000 in equipment from Defendants, which equipment was then leased back to Emulait for RTS to use in the manufacturing of Emulait's products.

54. Defendants represented to Emulait that the multi-million-dollar tooling and equipment contemplated by the Financing Lease was necessary to fulfill the Manufacturing Agreement. Defendants further represented that the tooling and equipment was being provided at a rate commensurate with, if not reduced from, the price Emulait would be charged in the open

165704295.1

market.

55.     Emulait reasonably relied on these representations. Roembke was a significant shareholder, on the Executive Board of Emulait, and held himself out as having decades of experience in the manufacturing industry.

56.     As described above, it was ultimately uncovered that the tooling and equipment could have been obtained at a fraction of the cost.

## V.    Emulait Sustains Millions of Dollars in Damages

57.     Emulait was charged approximately $6.5 million for tooling and equipment and now has nothing to show for it.

58.     Emulait is entitled to recover any and all amounts paid to Defendants, as well as all consequential damages associated with the material breaches of the Manufacturing Agreement.

59.     Moreover, Defendants are not entitled to any additional money from Emulait and should be responsible for any outstanding amounts owed under the Financing Lease.

60.     Additionally, as a result of Defendants' inability to timely deliver the products promised, Emulait was forced to postpone its commercial product launch by months.

61.     Marketing efforts conveying expected product release dates, in which Emulait invested substantial time and cost, were ultimately rendered useless, and had to be ignored and/or repeated months later.

62.     Even after commercial launch, concerns related to production capacity and supply prevented Emulait from marketing its products in earnest.

63.     Additionally, reduced production quantities prevented Emulait from availing itself of bulk shipping discounts, such as multiple daily UPS shipments rather than bulk freight, and the use of sea – as opposed to air – freight for international shipping, thus significantly increasing operating costs related to third-party logistics.

64.     More importantly, Defendants' actions, including, but not limited to, the use of the wrong substrate CAD during the manufacturing process, caused Emulait significant reputational harm of which Emulait is still feeling the negative effects today.

65.     Certain customers have returned products, vowed not to purchase additional and/or

165704295.1

replacement products, and posted damaging reviews online.

66.     In its efforts to combat this loss of goodwill, Emulait has spent significant money on additional marketing campaigns solely designed at addressing issues resulting from Defendants' defective production methods.

**VI.     Despite Material Breaches and Conflicting/Competing Interests, Defendants Demand More Money and Roembke Refuses to Stepdown from Executive Board**

67.     In spite of Defendants' clear breaches of the Manufacturing Agreement, Emulait remitted payments sufficient to satisfy all valid invoices and made repeated efforts to move past Defendants' shortcomings to try to salvage the relationship.

68.     However, in light of the above breaches, Emulait requested that Roembke remove himself from Emulait's Executive Board on or about September 12, 2024.

69.     Roembke did not respond, and further ceased communications regarding resolution of the outstanding issues under the Manufacturing Agreement.

70.     Accordingly, on October 25, 2024, Emulait, through counsel, sent Defendants a letter demanding restitution for: (a) all amounts paid for the defective, unnecessary, and/or overpriced manufacturing equipment; (b) the severe reputational harm Defendants caused to Emulait by producing and distributing defective products; (c) Emulait's wasted costs and efforts related to marketing Emulait products that Defendants were unable to timely deliver and repairing the reputational harm caused to Emulait; and (d) damages resulting from Defendants' unlawful price-gouging.

71.     Emulait did not receive a response to this correspondence or to Emulait's follow-up correspondence sent on November 8, 2024.

72.     Rather, on or about November 16, 2024, Emulait became aware of a purported notice of default dated October 22, 2024 from counsel for Defendants claiming various defaults on Emulait's part based on their severely distorted version of events and/or blatant falsehoods, demanding over $800,000.

73.     For example, Defendants claimed: (a) that Emulait accelerated deliverable timeframes – that is simply not true; (b) that Emulait sought alternative manufacturers abroad to

165704295.1

produce the Emulait products in breach of the Manufacturing Agreement – which Emulait only did well after Defendants materially defaulted and Emulait found another manufacturer in accordance with Section 2.2 of the Manufacturing Agreement; and (c) that Emulait failed to pay invoices within 60 days – which Emulait did only after the parties explicitly agreed that invoices would be paid within 120 days.

74.     Defendants will also try to shift the blame to Emulait by claiming that Emulait's initial projections were too high and therefore high volume tooling was not needed, and that Emulait changed its design multiple times causing further delays.

75.     However, the parties had worked together on the Gantt chart (project schedule) throughout the end of 2022, and Defendants were tasked with instituting a plan to build the required tooling in line with the Gantt chart. Defendants failed to do so whether or not the projections ultimately proved to be accurate.

76.     One of Defendants' major errors is that rather than first make the low volume tooling in order to ensure that the production process was perfected and then make the high volume tooling, as is standard in the industry, Defendants opted to try to make the low and high volume tooling at the same time.

77.     This caused additional delays and further costs that Defendants are wrongfully trying to pass on to Emulait.

78.     Further discussions have gone nowhere. Emulait is left to file this action and seek all available relief and recover the millions of dollars in damages caused by Defendants' breaches and bad acts.

79.     Punitive damages should also be imposed because Roembke's actions are oppressive, fraudulent, and/or malicious.

## COUNT I

## BREACH OF FIDUCIARY DUTY

### (Against Roembke)

80.     Emulait repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

11

165704295.1

81.   As a Director on the Executive Board, Roembke owed fiduciary duties to Emulait whereby he was obligated to act in the best interests of Emulait.

82.   Roembke breached the fiduciary duties owed to Emulait by, among other things: (a) entering into the Manufacturing Agreement for his own financial gain and to the detriment of Emulait, knowing that he and his newly-formed company were incapable of providing the services outlined in the Manufacturing Agreement; (b) negotiating and inducing Emulait to enter into the Financing Lease knowing that the tooling and equipment that Roembke induced Emulait to purchase was both inadequate and unnecessarily excessive for Emulait's purposes, priced significantly above market value, and of woefully deficient quality; (c) refusing to consider and/or completely disregarding the interests of Emulait in trying to resolve this dispute; and (d) knowingly and intentionally putting himself in a position that presents clear conflicts of interests.

83.   Emulait has been significantly damaged as the direct result of Roembke's breach of his fiduciary duties, which amount shall be more specifically determined at the time of trial.

84.   The actions of Roembke are oppressive, fraudulent, and/or malicious, and entitle Emulait to an award of punitive damages.

## COUNT II

## BREACH OF CONTRACT

### (Against Defendants)

85.   Emulait repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

86.   The Manufacturing Agreement constitutes a valid and binding contract.

87.   Emulait performed all of its obligations under the Manufacturing Agreement.

88.   RTS has breached the Manufacturing Agreement by, among other things: (a) failing to maintain sufficient quality control standards pursuant to § 9; (b) failing to package, mark, and otherwise prepare Emulait products in a manner acceptable to standards of common carriers for shipment, and adequate to ensure safe arrival of the products at the applicable delivery location pursuant to § 4; (c) failing to timely deliver products pursuant to § 4; and (d) failing to ensure that the products produced by RTS for Emulait were free from defects in materials and workmanship

12

165704295.1

pursuant to § 13.

89. Roembke Mfg. and Roembke are the alter egos of RTS and should be held liable for RTS's obligations due to Emulait.[2]

90. RTS and Roembke Mfg. are both owned and/or controlled by Roembke.

91. Based off of Roembke's representations, Emulait reasonably believed that it was retaining the services of Roembke Mfg., an Indiana corporation which has been in business for roughly 50 years, and not a newly-formed Indiana LLC in which Roembke is the sole member.

92. Upon information and belief, RTS is undercapitalized and was only created to enter into the Manufacturing Agreement.

93. The equitable remedy of piercing the corporate veil is appropriate here where it appears that RTS is acting as the alter ego of Roembke Mfg. and Roembke.

94. Here, adherence to the notion of RTS being an entity separate and distinct from Roembke Mfg. and Roembke would result in injustice.

95. Emulait has been significantly damaged as the direct result of the breaches of the Manufacturing Agreement, which amount shall be more specifically determined at the time of trial but is in excess of $6.5 million.

**COUNT III**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants)**

96. Emulait repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

97. The Manufacturing Agreement constitutes a valid and binding contract.

---

[2] "The essence of the alter ego doctrine is to do justice whenever it appears that the protections provided by the corporate form are being abused. The following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. However, there is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case. Finally, the evidence supporting a finding of an alter ego must also be the cause of the injury and must have sentenced a fraud or promoted an injustice before the corporate veil can be pierced." *Ene v. Graham*, 546 P.3d 1232, 1237 (Nev. 2024) (internal citations and punctuation omitted).

13

165704295.1

98.    The implied covenant of good faith and fair dealing is a common-law duty applicable in all contracts under Nevada law.

99.    There is a special relationship between the parties because Roembke, the sole member of RTS and president of Roembke Mfg., also serves on the Executive Board of Emulait and owes fiduciary duties to Emulait.

100.   As set forth above, Defendants performed unfaithfully under the Manufacturing Agreement, denying Emulait its justified expectations.

101.   Emulait has been significantly damaged as the direct result of Defendants' breach of the covenant of good faith and fair dealing implied in the Manufacturing Agreement, which amount shall be more specifically determined at the time of trial but is in excess of $6.5 million.

## COUNT IV

## UNJUST ENRICHMENT (In the Alternative)

## (Against Defendants)

102.   Emulait repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

103.   Emulait conferred a benefit on Defendants by paying to Defendants millions of dollars and receiving nothing of equivalent value in return.

104.   Defendants used Emulait's funds to build out a new manufacturing facility for Defendants' benefit, to the detriment of Emulait.

105.   Defendants' acceptance and retention of the benefits conferred by Emulait would be inequitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Emulait demands judgment against Defendants for all relief allowed under the law, and further requests the following:

A.    Award Emulait monetary damages in an amount to be determined at trial, in excess of $6.5 million;

B.    Impose punitive damages against Roembke for breach of his fiduciary duties;

C.    Award Emulait its attorneys' fees and costs to the extent applicable;

14

165704295.1

D.   Award Emulait pre- and post-judgment interest to the extent allowed under Nevada law; and

E.   Such other relief that the Court deems equitable and just.

Dated: December 6, 2024                              FOX ROTHSCHILD LLP


                                                     */s/ Rex D. Garner*
                                                     REX D. GARNER
                                                     Mark J. Connot
                                                     Attorneys for Plaintiff EMULAIT, INC.
                                                     f/k/a PROXAMAMA, INC.

15

165704295.1